BROWN v. SCHLEIER et al.

(Circuit Court of Appeals, Eighth Circuit. November 10, 1902.)

No. 1,724.

**1. NATIONAL BANKS—POWERS—LEASING AND IMPROVEMENT OF REAL ESTATE.**
The power conferred on national banks by Rev. St. § 5137 [U. S. Comp. St. 1901, p. 3460], to purchase and hold such real estate "as shall be necessary for its immediate accommodation in the transaction of its business," includes the power to lease real estate for such purpose, and a bank does not exceed its powers by leasing ground for a term of years under an agreement with the owner that it will erect a building thereon for its use, providing it acts in good faith, and for the purpose of obtaining an eligible location and a suitable building in which to conduct its business. Nor is it limited to the construction of a building only sufficient for its own use; but, where it has acquired property by purchase or lease for the purpose authorized by the statute, it may improve the same in any manner that other prudent owners would do, so as to render it most productive.

**2. SAME.**
A lease of property by a national bank for 99 years is not ultra vires and void because the term will outlast its corporate life. Being authorized by the statute to purchase real estate in fee simple for specified purposes, it may acquire any lesser estate or interest which is vendible.

**3. SAME—INDEBTEDNESS—OBLIGATION TO PAY RENT.**
Nor is such a lease invalid because the aggregate rental which the bank agrees to pay during the term in monthly installments exceeds its capital stock. Such an agreement does not create an indebtedness for the aggregate amount of the installments, within the meaning of Rev. St. § 5202 [U. S. Comp. St. 1901, p. 3494].

**4. SAME—ACTS ULTRA VIRES—LIABILITY OF THIRD PARTIES.**
A lessor of real estate to a national bank for a long term, in which the bank covenants to erect a bank building which shall become part of the realty, cannot be held accountable to the stockholders or creditors of the bank because it may have exceeded its powers by expending more money in the erection of the building than it was authorized to do under the law, and more than was required by the terms of the lease; nor can such excessive expenditure be charged as a lien upon the property in favor of creditors after the same has passed into the hands of the lessor.

**5. SAME—POWERS OF RECEIVER.**
A receiver of a national bank, appointed by the comptroller of the currency, is not vested, by virtue of his appointment, with all of those visitorial powers over national banks which the United States, acting in its sovereign capacity, may exercise.

**6. SAME—SUIT AGAINST THIRD PARTIES.**
A receiver of a national bank cannot maintain a suit against a third party, based upon the alleged invalidity, as ultra vires, of a contract made by the bank which was fully executed 10 years prior to his appointment, and to which no objection was made at the time, either by the United States or by any stockholder.

Appeal from the Circuit Court of the United States for the District of Colorado.

This case passed off below on a demurrer to the bill of complaint, which was once amended before the demurrer thereto was sustained. (C. C.) 112 Fed. 577. The case made by the bill of complaint, as amended, is as follows: The People's National Bank of Denver, one of the appellees, was incorporated on July 30, 1889, under the national bank act, for the period of 20 years from July 1, 1889, with a capital stock of $300,000, divided into shares of $100 each. On September 12, 1889, it leased a lot of ground in the city of Denver, having

a front on Lawrence street of about 99 feet, from George C. Schleier, one of the appellees, for the term of 99 years from February 1, 1890, at a yearly rent of $13,975, which rent was to be paid in monthly installments of $1,164.58 during each month of the term. The lessee, the People's National Bank, hereafter sometimes termed the "Bank," agreed to erect within 18 months from and after February 1, 1890, at its own cost and expense, a substantial building, not less than four stories in height, to cost not less than $100,000. By the terms of the lease the lessee was to have no right to remove the building, but the same was to become a part of the realty. The lease also gave to the lessee and its assigns an option to extend the lease for the same rental for a term of 50 years from and after the expiration of 99 years. The bank took possession of the demised premises, and on or about the month of January, 1891, had completed the erection of a building thereon, eight stories in height, at a cost of $305,725.39. On July 19, 1893, the bank became unable to pay its depositors in due course of business, and the comptroller of the currency appointed J. B. Lazear as receiver thereof, pursuant to the provisions of the national bank act. Said Lazear remained in possession of its assets and affairs until August 21, 1893, when he was discharged; the bank having in the meantime levied an assessment of 20 per cent. upon its shareholders, and thereby restored its capital so that it was deemed safe for it to resume business. At the date last mentioned the business and affairs of the bank had become somewhat involved and commingled with the business of another bank known as the People's Savings Bank, which latter bank was located and did business in the bank building that had been erected by the People's National Bank, in which the latter bank also transacted its business. The People's Savings Bank, having become embarrassed, subsequently made an assignment to Fermor J. Spencer, assignee, who thereafter, on June 26, 1897, brought an action against the People's National Bank, in which action he recovered a judgment against it in the sum of $475,825.71 on November 30, 1899. About the month of January, 1897, the People's National Bank commenced to liquidate its affairs with a view of surrendering its charter, and on April 27, 1897, its stockholders, at a meeting duly held for that purpose, resolved to go into voluntary liquidation. On September 20, 1897, the bank called a meeting of its stockholders to consider a proposition to surrender the remainder of its leasehold term to Schleier, the lessor, stating in its notice to the stockholders that, as the income from the property which it had leased was less than the fixed charges, it had become necessary to take some action to relieve the bank. At that time there was due for rent in arrear under the lease, and for taxes which the lessee was obligated to pay, a sum amounting altogether to about $6,000. In compliance with action which appears to have been taken at said stockholders' meeting, the bank, subsequently, on October 30, 1897, surrendered its leasehold term to the lessor, and the lessor agreed, in consideration of such surrender, to discharge the bank from its liability to pay such rents and taxes as were then in arrears; also to discharge the bank from all further installments of rent which were to accrue under the lease. Some time after the bank had resolved to go into voluntary liquidation, to wit, on December 20, 1899, Earl M. Cranston was appointed receiver of the People's National Bank for the purpose of winding up its affairs. He continued to serve as receiver until May 27, 1901, when he resigned his office, and Edwin F. Brown, the present receiver and appellant, was duly appointed in his place and stead by the comptroller of the currency. In view of the premises, the complainant prayed that the court would decree that the lease executed by Schleier to the bank on September 12, 1889, was null and void, in view of the national bank act; that the agreement purporting to cancel and surrender said pretended lease was also null and void; that there might be a full accounting between Schleier and the receiver; and that whatever was found due to the receiver upon said accounting be declared a first and prior lien upon the bank building which the bank had erected, as well as upon the ground upon which it was situated. The bill was demurred to for want of equity, and the demurrer was sustained, whereupon a decree was entered dismissing the complaint. To reverse such decree an appeal has been prosecuted to this court.

James H. Brown (H. M. Orahood, Earl M. Cranston, Robert J. Pitkin, and William A. Moore, on the brief), for appellant.

R. D. Thompson (G. C. Bartels and James H. Blood, on the brief), for appellees.

Before SANBORN and THAYER, Circuit Judges, and LOCHREN, District Judge.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The bill in this case appears to have been exhibited, and a recovery is sought, upon the theory that the lease of September 12, 1889, was executed by the People's National Bank in excess of its corporate powers, and was therefore void; that Schleier, the lessor, was a party to the act whereby the charter of the bank was violated, and is therefore liable as a joint tort-feasor for all the damage which the creditors of the bank have sustained in consequence of the execution of the lease without lawful authority. It is urged, in substance, that the lease was ultra vires the bank, because it undertook, in violation of section 5137 of the Revised Statutes [U. S. Comp. St. 1901, p. 3460], to erect a building on the demised premises which it did not contemplate using "for its immediate accommodation in the transaction of its business," but did intend to rent in part to third parties. It is also claimed that the bank exceeded its powers in making the lease, because it contracted an indebtedness to an amount exceeding its capital stock, in violation of section 5202 of the Revised Statutes [U. S. Comp. St. 1901, p. 3494], by engaging to pay rent at the rate of $13,975 per annum for the term of 99 years; and incidentally it is claimed that the power conferred upon national banks by section 5137 of the Revised Statutes to purchase and hold such real estate "as shall be necessary for its immediate accommodation in the transaction of its business" does not comprehend the power to lease property with a view of erecting a building thereon for its accommodation in the transaction of its business, nor the right to lease property for a longer period than it is to exist as a corporation.

We entertain no doubt that the power conferred on national banks by section 5137 of the Revised Statutes to purchase such real estate as is needed for their accommodation in the transaction of their business includes the power to lease property whereon to erect buildings suitable to their wants. The power to purchase land is larger than the power to lease by as much as a fee simple estate is larger than a term for years, and the greater power includes the less. In the larger towns and cities of the United States, national banks usually find it necessary to locate themselves in the business centers, where property is most in demand and likewise most valuable. In the large cities it will doubtless sometimes happen that a bank cannot locate itself in a quarter where its business interests demand that it should be located, unless it leases property for a term of years and agrees with the owner to erect a building thereon suitable to its wants. That a national bank may purchase a lot of land and erect such a building thereon as it needs for the accommodation of its business admits of no controversy under the language of the

statute, and we perceive no reason why it may not likewise lease property for a term of years and agree with the lessor to construct such a building as it desires, provided, always, that it acts in good faith, solely with a view of obtaining an eligible location, and not with a view of investing its funds in real property or embarking them in speculations in real estate. Nor do we perceive any reason why a national bank, when it purchases or leases property for the erection of a banking house, should be compelled to use it exclusively for banking purposes. If the land which it purchases or leases for the accommodation of its business is very valuable, it should be accorded the same rights that belong to other landowners of improving it in a way that will yield the largest income, lessen its own rent, and render that part of its funds which are invested in realty most productive. There is nothing, we think, in the national bank act, when rightly construed, which precludes national banks, so long as they act in good faith, from pursuing the policy above outlined. The act was framed with a view of preventing such associations from investing their funds in real property, except when it becomes necessary to do so, either for the purpose of securing an eligible business location, or to secure debts previously contracted, or to prevent a loss at execution sales under judgments or decrees that have been rendered in their favor. When an occasion arises for an investment in real property for either of the purposes specified in the statute, the national bank act permits banking associations to act as any prudent person would act in making an investment in real estate, and to exercise the same measure of judgment and discretion. The act ought not to be construed in such a way as to compel a national bank, when it acquires real property for a legitimate purpose, to deal with it otherwise than a prudent landowner would ordinarily deal with such property.

We think that the lease in question was not invalid because it created a term that would outlast the life of the corporation in whose favor it was created. If a corporation is empowered to acquire real estate by purchase or lease for the transaction of its business, it matters not that it acquires an estate or interest which will not expire until after the death of the corporation, provided the estate or interest so acquired is vendible. Detroit Citizens' St. Ry. Co. v. City of Detroit, 12 C. C. A. 365, 64 Fed. 628; Nicoll v. Railroad Co., 12 N. Y. 121, 128; People v. O'Brien, 111 N. Y. 1, 37, 18 N. E. 692, 2 L. R. A. 255, 7 Am. St. Rep. 684; State v. Laclede Gaslight Co., 102 Mo. 472, 482, 14 S. W. 974, 15 S. W. 383, 22 Am. St. Rep. 789; Union Pac. R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 592, 16 Sup. Ct. 1173, 41 L. Ed. 265; Id., 10 U. S. App. 192, 2 C. C. A. 174, 51 Fed. 309. If the rule were otherwise, no corporation, unless it had a perpetual existence, could acquire land in fee, and in that event the objection made to the lease, based on the length of the term thereby created, would apply equally well if the grant had been in fee. The lease in question created an interest in land which was doubtless supposed to be of considerable value when the lease was executed; and although the interest so created was what is usually termed a "chattel interest," the term being less than a freehold, yet it was an interest which was salable during the life of the corporation or on its dissolution, and

might have become a very valuable asset of the bank. Such terms as the one created by this lease are sometimes as marketable as estates in fee, and we perceive no reason why the instrument which created it should be held invalid, any more than a deed conveying an estate in fee, which would outlast the life of the bank. A corporation, like a natural person, should be allowed to hold and enjoy a leasehold estate that will outlast its own existence, provided it can be alienated at or prior to its dissolution. Moreover, the rule being that, in such a case as the one at bar, the personal covenant of the corporation to pay rent would not be enforceable against it after the expiration of its charter (Lorillard v. Clyde, 142 N. Y. 456, 37 N. E. 489, 24 L. R. A. 113, and cases there cited), it is not apparent that any sufficient reasons exist, based on the length of the term, to render the lease invalid

We are furthermore of opinion that the lease in controversy was not invalid because the gross rents payable during the term would have amounted to a sum exceeding $300,000, which was the amount of the bank's original capital. The gross rents that were to accrue and would have accrued at intervals during the 99-year term, if the lease had not been surrendered or canceled, do not, in our judgment, constitute an indebtedness, within the fair intent and meaning of section 5202 of the Revised Statutes [U. S. Comp. St. 1901, p. 3494]. The national bank act confessedly confers power upon national banks to lease property which they need for the convenient transaction of their business, and it contains no express provision limiting the duration of such leases. Their duration is left to be determined by the judgment and discretion of the bank or its board of directors. Very frequently such associations are compelled to pay a large annual rental, and it can hardly be supposed that congress intended that the various installments of rent that an association has obligated itself to pay under a lease for a long term of years, which it executed because it was necessary to do so to secure an eligible business location, should be aggregated and counted as a debt within the purview of section 5202, supra. Rent is one of those ordinary expenditures which such associations are compelled to incur and pay; and installments of rent that are to be earned by the occupation of the demised premises in future years, and may never in fact be earned, can hardly be esteemed an indebtedness, and certainly not an indebtedness within the fair purview of section 5202, until it has accrued. In Deane v. Caldwell, 127 Mass. 242, 244, it was held that, before the day on which rent is covenanted to be paid, it is in no sense a debt. It was also held by the circuit court of the United States for the Southern district of Ohio in Trust Co. v. Armstrong, 35 Fed. 567, that rent which was to accrue in future, under the terms of a long lease taken by a national bank, but which had not been actually earned by occupation, could not be proven, as against the receiver of the bank, as a debt; it appearing that the receiver had declined to take possession of the demised premises and assume the burdens of the lease. It was also held by the supreme court of the United States in City of Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19, 19 Sup. Ct. 77, 43 L. Ed. 341, that the annual installments of rent which a city had agreed to pay to a

water company for the period of 25 years, for the use of water, could not be aggregated and counted as a debt, and added to the other indebtedness of the city, for the purpose of showing that the city had contracted an indebtedness in excess of the amount permitted by its charter. See, also, City of South Bend v. Reynolds (Ind. Sup.) 57 N. E. 706, 707, 49 L. R. A. 795. We conclude, therefore, that it cannot be successfully claimed that the bank exceeded its powers in executing the lease, because it thereby contracted an indebtedness in excess of the amount prescribed by section 5202, Rev. St. [U. S. Comp. St. 1901, p. 3494].

It follows, from what has been said, that if the lease in question was invalid when it was executed, that which rendered it so was the covenant of the bank to expend as much as $100,000 in the erection of a building on the demised premises. The bill avers that it spent more than that amount, to wit, the sum of $305,725; but the lease did not bind it to incur that expense, and we fail to see any ground upon which Schleier, the lessor, can be held accountable to the creditors of the bank or to the United States because the bank saw fit to erect a more expensive building than it had engaged to build. The lessor, after the execution and delivery of the lease, was not in a situation where he could be heard to complain because the lessee was making more expensive improvements than it had agreed to make. Even if it be conceded, therefore, that the bank exceeded its powers in expending as much as $305,725 in the construction of a building, yet we are unable to hold that the lessor is chargeable with the amount of an excessive expenditure which he was powerless to prevent. Another fact to be kept in mind is that the case in hand is not one where the bank assumed to exercise a power which did not belong to it; but it is a case where, in the exercise of a power that was clearly conferred, it misused or abused it by making a greater expenditure for an authorized object than it ought to have made. Besides, the wrongful expenditure was made 10 years before the present bill was filed. The building was completed in January, 1891, and the transaction at that time became an executed transaction. Moreover, while the matter was in fieri, no stockholder, or other person authorized to complain, raised his hand to arrest the unauthorized expenditure, although the act was done publicly; nor did the United States, which granted the bank's charter, take any steps to arrest the unauthorized expenditure by the bank, on the ground that its charter was being violated. Furthermore, the act complained of was not malum in se, but at most was simply ultra vires.

On this state of facts the inquiry arises whether the transaction is one of which the receiver of the People's National Bank is authorized to complain; and this question, we, think, should be answered in the negative. The receiver is one who was appointed by the comptroller, under section 5234 of the Revised Statutes [U. S. Comp. St. 1901, p. 3507], to liquidate the affairs of the bank; it having become insolvent. As such receiver he is vested with all the rights of creditors and the rights of the corporation itself, and may doubtless challenge any wrongful act which creditors could challenge, and maintain such suits against third parties, including actions against directors and

stockholders of the bank on account of wrongful and fraudulent acts, as the corporation might maintain. Hayden v. Thompson, 17 C. C. A. 592, 71 Fed. 60, and cases there cited. But we think that, in virtue of his office as receiver, he is not authorized to challenge or impeach an executed transaction between the bank and a third party, like the one now in hand, that was simply ultra vires, and which, though known to the United States, through its proper officials, at the time it was undertaken and consummated, and while the excessive investment of its funds was being made, was neither arrested nor complained of by the United States or any creditor or stockholder of the bank. In Case v. Terrell, 11 Wall. 199, 202, 20 L. Ed. 134, it was held that a receiver of a national bank represents the bank, its stockholders, and creditors, but that such officers do not in any sense represent the government. A receiver of a national bank, therefore, by virtue of his appointment under section 5234, is not endowed with all of those visitorial powers over national banks which the United States, acting in its sovereign capacity, may exercise. The United States, if it had thought proper to have done so, could have proceeded against the People's National Bank for a forfeiture of its charter because of the alleged abuse or misuse of its charter powers. It did not do so, but permitted the investment to be made, evidently upon the theory that it would be profitable to the bank and not harmful to the public; and, having done so, a receiver appointed by the comptroller years afterwards, has no right to impeach the investment, and ask that it be declared void, and that the property of a third party, who dealt with the bank in good faith, be charged with a lien for the sum expended, now that the investment has proven to be unprofitable.

There are some ultra vires acts, when committed by a national bank, which the government alone is permitted to call in question after such acts are committed. For example, in Bank v. Stewart, 107 U. S. 676, 678, 2 Sup. Ct. 778, 27 L. Ed. 592, where such a bank had loaned money on the security of its own stock in admitted violation of section 5201 of the Revised Statutes [U. S. Comp. St. 1901, p. 3494], the court decided, in substance, that, if any one "except the government" could challenge the transaction, it could only be done before the contract was executed. In the well-known case of Bank v. Matthews, 98 U. S. 627, 628, 629, 25 L. Ed. 188, it appeared that a national bank had loaned money on the security of real property in violation of section 5136 of the Revised Statutes [U. S. Comp. St. 1901, p. 3456], and was proceeding to foreclose the mortgage, whereupon the mortgagor sought to enjoin the foreclosure proceedings upon the ground that the mortgage was a nullity, because the bank had no authority to accept it as security for a loan. It was held, however, that the act of making the loan on the security of real property, although ultra vires, did not render the mortgage void; that the mortgagor could not successfully resist the foreclosure proceedings because of the ultra vires character of the transaction; and that the United States alone could challenge it, doing so by a proceeding to oust the bank of its franchises. The court said that a private person could not directly or indirectly usurp this function of the government, but that it was the right of the government to determine wheth-

er it would complain of the transaction. The same rule was reaffirmed in Reynolds v. Bank, 112 U. S. 405, 413, 5 Sup. Ct. 213, 28 L. Ed. 733, and was followed and enforced by this court in Sioux City Terminal R. & Warehouse Co. v. Trust Co. of North America, 27 C. C. A. 73, 83, 82 Fed. 124, 134. We are of opinion that the same doctrine is applicable when, as in the present case, a national bank makes an excessive investment in real property for the purpose of obtaining an eligible business location. Granting that it is guilty of an abuse of its powers in so doing, and that while the act is under way a stockholder may enjoin the threatened wrong, yet after the investment is made, and the conveyance to the bank has been executed and delivered, it is not void, but operates to vest in the bank such an estate as the conveyance by its terms creates. Moreover, when the conveyance is made, and the funds of the bank have been invested therein, the estate so acquired becomes an asset of the bank, and no one can question the transaction, unless the government, acting in its sovereign capacity, elects to do so. The remedy for the wrong is solely in the hands of the government. A receiver appointed by the comptroller of the treasury on the insolvency of the bank, pursuant to section 5234 of the Revised Statutes [U. S. Comp. St. 1901, p. 3507], and armed simply with the rights of the corporation and its creditors, cannot do so.

The bill of complaint in this case does not charge or suggest that the cancellation and surrender of the lease on October 30, 1897, was inspired by an intent on the part of the bank or Schleier, the lessor, to hinder, delay, or defraud the bank's creditors. The motives of Schleier, the lessor, in that transaction are not impugned. All that is alleged concerning the cancellation of the lease is that on September 20, 1897, when the bank was about to go into voluntary liquidation, a notice was issued by the president of the bank to stockholders, advising them of a meeting which had been called to be held on October 30, 1897, to consider the advisability of surrendering the lease to the lessor, because the income from the building upon the demised premises had become less than the fixed charges. This statement, as contained in the notice to stockholders, that the income was insufficient to meet the fixed charges, is denied in the bill only upon information and belief; but no allegation is contained therein showing what the income amounted to at that time, although it is admitted that two or three installments of ground rent and certain taxes were at the time in arrears. The conclusion that may be fairly drawn from the averments of the bill is that the leasehold had become a burden to the bank, rather than an asset; that it was not salable; and that the officers and stockholders considered it prudent and for the best interests of the bank to surrender the term and avoid liability for further installments of rent. At all events, there are no allegations in the bill showing that the lease was fraudulently canceled by collusion between the lessor and lessee, and with a view of depriving the bank of an asset which was deemed to be of value; nor does the bill seem to have been filed with a view of obtaining relief on that ground. The bill was evidently framed upon the theory that the lease was void ab initio for want of power on the part of

the bank to execute it, and that the receiver could for this reason charge the amount that had been expended upon the demised premises in the erection of the building as a lien upon the same and upon the ground on which it was erected. We are of opinion, for the reasons already stated, that this theory is unsound.

We conclude that the demurrer to the bill was properly sustained, and that the decree below should be affirmed. It is so ordered.